UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA          :

      v.                                    :        **AFFIRMATION**
                                                                **23 Cr. 603 (ALC)**
**ROBERT RUMPH**,                  :

           Defendant.            :
------------------------------------------------------X

      I, Sylvie Levine, hereby affirm under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am an Assistant Federal Defender with the Federal Defenders of New York and have been appointed to represent Robert Rumph in this case.

      2.     I make this affirmation in support of Mr. Rumph's motion pursuant to Fed. R. Crim. P. 12 to suppress physical evidence obtained in violation of the Fourth Amendment to the United States Constitution, the warrantless and unreasonable seizure of Mr. Rumph and search of his car, and the fruit of those unlawful actions, and to controvert the search warrants.

      3.     All statements herein are made upon information and belief, unless otherwise indicated.

      4.     I have reviewed documents and records provided to me by the Government,[1] and conducted independent investigation into the facts and circumstances surrounding this case.

      5.     At approximately 10:25 a.m. on July 7, 2023, a man – whom the NYPD labeled "Robber-1" – wearing a mask, hat, gloves, sunglasses, and a hooded sweatshirt, entered a smoke shop in the vicinity of 217 East 167th Street, Bronx, New York.   Criminal Complaint ¶ 4.

---

[1] The citations to documents, recordings, and videos from the discovery are included here. Undersigned counsel expects that all such evidence would be introduced during an evidentiary hearing.   If the Court wishes to review the materials before then, I will provide a copy.

Brandishing an item that appeared to be a firearm, Robber-1 forced the two store clerks into the back room of the shop.  See id.  Robber-1 ordered one clerk to retrieve cash from the register, and the clerk provided approximately $400 to the robber.  See id.  Robber-1 secured the clerks' hands with duct tape and took one of the clerks' cell phones.  See id.  Robber-1 exited the store.  See id.  Robber-1's actions inside the store were captured on video surveillance cameras.  See id.

6. After exiting the smoke shop, Robber-1 walked to a red SUV in the vicinity of Sherman Avenue and East 167th Street and entered the front passenger-side door of the car.  See id.  The car drove away.  See id.[2]

7. An employee from the smoke shop called 911.  USAO_947.  NYPD officers immediately responded to the smoke shop on July 7, 2023.  As captured on their body worn cameras ("BWCs"), the officers asked for a description of the robber; one of the victims described him as "short," with dark skin, wearing sunglasses, a hoodie, and mask.  See USAO_52.  After further discussion with the victims, one of the responding officers put an "updated description" over the radio: male, about 5'5", dark skin, sunglasses, white mask, gray hoodie.  Id.

8. On October 1, 2023 – i.e. almost three months after the robbery – Officer Kenneth Ayala with the Joint Robbery Task Force of the New York City Police Department and the Bureau of Alcohol, Tobacco, and Firearms was driving in Manhattan.  It was just after 1:30 p.m. and sky was clear.  See USAO 55.  Officer Ayala (identifying himself as "Robbery Task Force Portable") used his police radio to reach out to the local precinct operator ("Central"), seeking

---

[2] After collecting additional video surveillance footage from July 7 from the surrounding area, the NYPD determined the red SUV had white doors on one side.  See id.

the assistance of other NYPD officers.  See USAO_1909.  The radio run contains the following statements, in relevant part:

> Robbery Task Force Portable ("RTFP"): Robbery Task Force Portable.
> Central: Robbery Task Force Portable.
> RTFP: Central, do you have a vehicle available to 85 me[3] at Second Avenue -- and 110th street?
> Central: 10-4.[4]  What is that going to be in regards to?
> RTFP: It's going to be in regards to, a vehicle we're following in regards to a gunpoint robbery pattern.  Right now we're following the vehicle.  We're on -- Second Ave, south, 109th street. The vehicle is going to be a red ford escape, 4 door SUV with temporary tags. Looks like it's a Georgia temporary tag, Sam-1-6-5-0-0-4-3.
> [unintelligible crosstalk, radio static]…[unknown speaker:] that unit -- attempting to pull that vehicle over now.
> RTFP: We're just following the vehicle we would like the vehicle to be stopped by another unit please.
> Unknown officer: Going southbound on 2nd?
> Unknown officer: What kind of car is it? Ford escape?
> RTFP:  Yes, red ford escape, 2nd avenue southbound he's actually approaching 105. There's an RMP.[5]  I see you guys [unintelligible].
> RTFP: RMP 391423, it's going to be the red SUV that's passing you with the white doors.
> [Unknown speaker:] Car being stopped 104 and 2nd Ave.  I'll keep you advised.

USAO_1909.

9. Six NYPD officers, from three RMPs, arrived at 104th Street and 2nd Avenue. They stopped the red SUV and the driver immediately extended his arms out through the driver side window so the officers could see that his hands were empty as they approached him. USAO_55.  The first officer who approached the window asked if the driver "had anything on him" or "anything I need to worry about."  Id.  The driver politely and clearly responded to both questions: "no, sir."  Id.  There were no other passengers in the vehicle.  Id.  The officers

---

[3] Based on my review of the NYPD Signal Codes, which are available on the internet, I know that "85" means "need additional unit."

[4] Based on my knowledge and experience, "10-4" means "acknowledgement."  See n. 2, supra.

[5] Based on my knowledge and experience, "RMP" stands for "radio motor patrol," which generally refers to a marked NYPD car.

3

ordered the driver to get out of the vehicle, which he did.  Id.  The officers immediately placed him in handcuffs, with his hands behind his back.  Id.; USAO_56.  After Officer Ayala arrived, one of the first-responding officers explained their actions: "we're just doing this to help you guys out."  Id.  Law enforcement moved the driver to the back of the vehicle.  Id.  One officer stood behind the driver and another officer stood to the driver's right; throughout the detention, one or both of them had their hands on Mr. Rumph's arms.  Id.  The driver followed instructions and stood where the officers told him to.  The other four uniformed officers and the task force officer were all positioned around Mr. Rumph and the officers flanking him; all of the officers were outfitted with service weapons.  Id.  They asked the driver for identification and he said it was in his pocket.  Id.  The officer standing to his right retrieved the wallet.  The robbery task force officer asked the driver if he had "weapons, guns, or knives" on him or in the car, and he said no.[6]  Id.

10. Based on my observations of the BWC, the driver of the car was Robert Rumph.

11. At the time the NYPD officers stopped Mr. Rumph's car, ordered him out of it, and placed him in handcuffs, they had been given no information except "85" regarding a vehicle related to a robbery investigation.  They were supplied with no information about the robbery or the robber.  They had not witnessed a traffic infraction of any kind, nor did Officer Ayala tell them that the red SUV had committed a traffic infraction of any kind.  I reviewed the written radio runs.  USAO_1909-18.  The written reports reflect the same information captured on the audio: an officer from the Robbery Task Force asked for assistance and multiple units from the 23rd precinct responded to the scene.  There is no mention of any traffic infraction.

---

[6] He also told them there was marijuana in the car.

I reviewed the electronic memobooks of the NYPD officers who responded to the scene. The memobooks belonging to Patrol Officers Jason Quiles (USAO_1910-14), Vincent Lanzieri (USAO_1918-21), Anthony Lardo (USAO_1922-25), Giuseppe Cappuccia (USAO_1934-35), and Shamme Akter (USAO_1937-44), contained no mention of any stop at Second Ave and 104th Street, nor any mention of Robert Rumph.  Only one Patrol Officer, Luke Kirtonia (USAO_1926-33), mentioned the stop in his memobook: he wrote that he responded at 1:46 p.m. to E. 104 Street and 2nd Avenue for a report of "possible crime: suspicious vehicle" and then resumed patrol.

To date, I have not received any record of any traffic citation being issued to Mr. Rumph. I requested from the government – but did not receive – any other materials that might have documented the justification of the stop of the vehicle, including any reference to a traffic infraction.  Specifically, I requested, but did not receive: any and all recorded communications between Officer Ayala and the six other members of law enforcement on the scene; any and all evidence of, or documentation regarding, a traffic infraction Mr. Rumph allegedly committed; any and all dashcam videos from the NYPD vehicles that were on the scene; and any other "stop reports" or other NYPD paperwork regarding the stop of Mr. Rumph's vehicle or the decision to detain him.[7]

Despite this dearth of records, Officer Ayala told Mr. Rumph that one of the "couple of reasons" he was pulled over was because he had run a red light back at 116th Street and 2nd Avenue.  USAO_57.  Officer Ayala entered Mr. Rumph's arrest into his electronic memobook later that night, after 8 p.m.  At that time, he wrote: "car stop in regards to Pattern 23-24 and violation."  USAO_1915-17.

---

[7] An officer on the scene specifically asked Ayala if he would do the "stop report," and Officer Ayala assured him he would.  USAO_55.  No such report has been produced to date.

12. Shortly after Mr. Rumph was placed in handcuffs on October 1, Officer Ayala told one of the police officers on the scene about the July 7 robbery. He described the actions of Robber-1, supra. USAO_55. Having just observed Mr. Rumph standing outside of his vehicle, Officer Ayala immediately knew that Mr. Rumph was not Robber-1. He told the fellow officer: "He doesn't … like right now, just looking based off his goatee, <u>he doesn't fit the guy that went in with the gun</u>, but we'll figure that out." USAO_55 (emphasis added). Officer Ayala also told an officer on the scene about the July 7 robbery: "We got one male with a gun, goes into the store, does the robbery, but he was dropped off and picked up by this … what we believe to be the individual driving this car." Id.

In addition, Officer Ayala also knew (or should have known) that Mr. Rumph did not meet the other physical descriptors of Robber-1. Specifically, Mr. Rumph was more than half a foot taller than Robber-1. Mr. Rumph is 6 feet tall. See USAO_955-957 ("Arrest Report"). He was standing next to the SUV at his full height. See USAO_55. He could not be described as "short," or as "5'5"" – which is how the store clerk described Robber-1 to the NYPD. See ¶ 7, supra.

13. Officer Ayala and some of the other officers then searched the vehicle. The search included opening various doors in the front and back, moving seats around, pushing on the AC vents, looking inside bags that were inside the vehicle, and going through the glove compartment. USAO_59.

14. After the search of the vehicle, Officer Ayala radioed Central with Mr. Rumph's ID and was told there were no results:

> RTFP: Robbery portable, Central.
> Central: Robbery portable.
> RTFP: Yeah Central, Can you run a client ID for me please?
> Central: Alright, 10-4, proceed with the particulars

> RTFP: It's gonna be a New York 722711085
> Central: Alright, 10-4 stand by give me one sec.
> …
> Central: Robbery portable on here?
> RTFP: [unintelligible] Central.
> Central: Regard to that client ID, it's a no entries.   No entries were found.
> RTFP: 10-5 Central, you said no, not on file?
> Central: 10-4 nothing found.

USAO_1909; USAO_59.

While that exchange was happening over the radio, Officer Ayala and another officer used their phones to input Mr. Rumph's personal data into a database.   At that point, they learned there was an "active ICard" with "probable cause to arrest."   USAO_55.   The ICard was for an allegation <u>unrelated</u> to the July 7 robbery.   USAO_952-54 (arrest report for a crime that allegedly took place on April 19, 2023, listing the charges as Vehicle and Traffic Law (VTL) 600 (leaving the scene of an accident with serious injury)).[8]   Only then, citing that "probable cause," the officers arrested Mr. Rumph.   Mr. Rumph was not charged with any crimes relating to the July 7 robbery that day.

      15.      On October 11, the United States Attorney's Office applied to Magistrate Judge Valerie Figueredo for two search warrants: (1) to search a Black Samsung Galaxy Cellphone and a Blue AT&T Calypso Cellphone, USAO_862-84, USAO_885-901, and (2) for cellphone location information for one of the phones found during the search of the car.   USAO_885-901.

Both warrants were submitted with sworn affidavits from Task Force Officer Kenneth Ayala.   See id. ("Ayala Affidavits").[9]   In both affidavits, Ayala averred: "I am the case agent with primary responsibility for this investigation and have been personally involved in this

---

[8] That charge did not involve the vehicle Mr. Rumph was driving on October 1; the vehicle involved was a 2004 silver Honda Pilot.   USAO_1037-1132.

[9] The sections of each affidavit titled "Probable Cause" appear to be identical in both warrants, but they are numbered differently.

7

investigation." Id.

In his Affidavits, Officer Ayala swore to the following facts regarding Mr. Rumph's October 1 stop and arrest and the search of the vehicle:

> At approximately 1:30 p.m. on October 1, 2023, I was driving southbound on the FDR Drive in the vicinity of the 125th Street exit when I observed a red Ford escape with white doors ("Vehicle-1") matching the description of the Getaway Car. I alerted NYPD patrol officers in the vicinity that I saw a vehicle I believed could be the Getaway Car. NYPD officers began to follow Vehicle-1, and conducted a traffic stop of Vehicle-1 after the driver ran a red light. The occupant of Vehicle-1 identified himself as ROBERT RUMPH. NYPD officers determined that RUMPH had an open NYPD warrant for an unrelated offense in the 32nd Precinct. He was placed under arrest.
> NYPD officers conducted a search of Vehicle-1 incident to the arrest of RUMPH…

Ayala Affidavits.

In his Affidavits, Officer Ayala also explained his belief that Mr. Rumph was involved in the July 7 robbery:

> Based on my personal observations of RUMPH, my review of surveillance video of the July 7, 2023 Robbery, and my review of NYPD officer body camera video of RUMPH's arrest, I know that RUMPH's physical appearance resembles Robber-1. In particular, RUMPH has a limp which resembles the limp of Robber-1.
>
> Based on the foregoing, I believe that Vehicle-1 is the Getaway Car from the July 7, 2023 Robbery, and that RUMPH was involved in the July 7, 2023 Robbery.

Id.

16.     The police ultimately collected various physical items from the SUV that they believe were the same as items worn by Robber-1 during the July 7 robbery. See Criminal Complaint ¶ 5.  Mr. Rumph also made statements to police in an undated audio-recorded post-arrest interview.  USAO_951.

17.     Mr. Rumph was arrested for the instant offenses on October 19, 2023 and presented in federal court in the Southern District of New York that day.  See Dkt. Nos. 4; 1 (Criminal Complaint, 23 Mag. 6844).  He was released on bail conditions, which remain in

8

place.  See id.  The Criminal Complaint charged Mr. Rumph with conspiracy to commit Hobbs Act robbery and Hobbs Act robbery of a smoke shop in the Bronx on July 7, 2023.  See id.  On November 16, 2023, an Indictment was filed charging Mr. Rumph with the same two counts. See Dkt. No. 6.

**WHEREFORE**, on the grounds set forth in the Memorandum of Law, it is respectfully requested that this Court enter an Order granting Mr. Rumph's motion to suppress evidence, obtained in violation of his Fourth Amendment rights pursuant to the United States Constitution, and controverting the search warrant, or in the alternative, granting an evidentiary hearing on this motion, and such further relief as this Court deems just and proper.

Dated:      New York, New York
            May 28, 2024

                                    /s/
                                    **SYLVIE LEVINE**