```
Federal Defenders                                      Southern District
OF NEW YORK, INC.                                52 Duane Street, 10th Floor
                                                      New York, NY 10007
                                           Tel: (212) 417-8700 Fax: (212) 571-0392
```

Tamara Giwa                                                    Jennifer L. Brown
*Executive Director*                                          *Attorney-in-Charge*

September 6, 2024

**VIA ECF**
Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   **United States v. Robert Rumph**
      **23 Cr. 603 (ALC)**

Dear Judge Carter,

    I write in support of Mr. Rumph's pending motion to suppress evidence, see Dkt. Nos. 20, 21, 22, 29, following the evidentiary hearing that was held on August 7, 2024.[1] At the hearing, the government called a single witness to testify: Detective Kenneth Ayala of the NYPD, who is assigned to the Joint Robbery Task Force, a project with ATF. See Hearing Transcript ("Hrg. Tr."), p. 5-7.

**Mr. Rumph was Stopped, Arrested, and Detained Unlawfully**

    As soon as police officers pulled over Mr. Rumph's car on Second Avenue on October 1, 2023, he was removed from his vehicle, handcuffed, and escorted away from his car; he remained surrounded by at least 6 uniformed, armed police officers, two of whom remained holding his arms behind his back, monitoring the handcuffs. The police officers' actions constituted a de facto arrest. See Rumph Motion to Suppress ("Rumph Mot.") at 1-3 (citing United States v. Marin, 669 F.2d 73, 81 (2d Cir. 1982) ("[P]robable cause is necessary when police restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be 'tantamount' to an arrest.")).

    This arrest of Mr. Rumph was made without probable cause. The testimony at the hearing confirmed that the Detective Ayala had reason to be suspicious that the red Ford escape was the one that drove away from the July 7 robbery, but he had no identifying information

---

[1] Mr. Rumph also moved to controvert the search warrants. Regarding this issue, the Court denied a hearing and indicated it would rule on that motion based on the written submissions.

about the driver of that car. Thus, he did not have probable cause to arrest the person who happened to be driving the car three months later.[2]

Officer Ayala testified that on October 1, he decided to stop the red Ford escape with two white doors because it matched the unique description of the car that, on July 7, 2023, had picked up a robber after the robbery of a smoke shop in the Bronx. Hrg. Tr. 31 ("It's very specific and very – very similar to the same vehicle I was investigating.")[3]

But, as of October 1, Detective Ayala had no identifying information about the July 7 "getaway driver." To the contrary, he only knew that on July 7 "[t]he driver of the vehicle [was] wearing like a white cut sleeve, like a white tank top." Hrg. Tr. 22; see also Govt. Ex. 2A (still image of the driver). The driver was not hiding his appearance in any way (no mask, no gloves, no sleeves, nothing obscuring his person). Hrg. Tr. 66. Still, the quality of the surveillance video made it impossible to determine the identity of that person; Detective Ayala could only determine that the person was male and dark skinned. Id. Detective Ayala made no further headway towards an identification over the next three months: "Leading up to October 1st from the incident of the robbery, we had no identification of any of the operator of the red vehicle." Id. at 33.

On October 1, Detective Ayala had no basis to conclude that the operator of the Ford escape was the same as the operator on July 7. In the almost-three months between July 7 and October 1 of 2023, Detective Ayala conceded he had no idea where the car had been, who had been driving it, or if it had changed hands:

> Q. And in between July 7 and October 1 of 2023, that's almost three months, right?
> A. Yes.
> Q. You have no idea where that car was between July and October, right?
> A. That's correct.
> Q. You don't know who was driving it?
> A. That's correct.
> Q. If it was sold?
> A. That's correct.
> Q. If it was borrowed?
> A. That's correct.

---

[2] There is no question that Mr. Rumph was put under arrest for the July robbery; it was not for any traffic infraction – indeed, Detective Ayala did not tell the arresting officers anything about any alleged red-light violation before they arrested him. Hrg. Tr. 43 (Q. Did you also mention on the radio call that you had seen the vehicle run a red light? A. No.).

[3] At the hearing, Detective Ayala said he also saw a "white-colored temporary license plate" on the Ford escape Hrg. Tr. 31-32, implying that this, too, matched the description of the car from the robbery. But in the surveillance images from July 7 viewed by Detective Ayala, it is impossible to conclude whether or not the white plate on the car that picked up the robber was temporary or not; indeed, on the surveillance footage, it looks exactly the same as any other white license plate. See Gov't Ex. 5A.

>   …
>   Q. And you know that anyone with a key can drive a car, right?
>   A. Yes.

Id. at 75.

And, when Detective Ayala saw the car on October 1, it was not in the vicinity of the robbery; it was in a different borough altogether. Id. at 76. (He also immediately concluded that Mr. Rumph did not look like the man who had entered the smoke shop and committed the robbery. Id. at 87.) Thus, at the time Mr. Rumph was handcuffed and placed under a de facto arrest, there was insufficient probable cause to do so. The fruits of his unlawful seizure must be suppressed. See Rumph Mot. 6 (discussing the exclusionary rule).

**Mr. Rumph's Car was Searched Unlawfully – Twice – Without a Warrant**

Detective Ayala testified that he searched the red Ford escape twice on October 1, 2023. He conducted both searches without search warrants and in contravention of the Fourth Amendment. The fruits of those searches must also be suppressed.

Warrantless searches and seizures are presumptively unreasonable under the Fourth Amendment. See Rumph Mot. 1; Mincey v. Arizona, 437 U.S. 385, 390 (1978). Absent an established exception to the warrant requirement, evidence obtained thereby must be suppressed. Mapp v. Ohio, 367 U.S. 643, 654-55 (1961).

Detective Ayala was fully capable of applying for a search warrant. He testified that he knows what a search warrant is, knows how to get one, and that he has done so "many, many" times. Hrg. Tr. 88. Specifically, he testified that he knows he can seek a search warrant for a car that he has taken into custody. Id. Still, on October 1, Detective Ayala never sought a search warrant for the Ford escape. Id. at 88-89.

Detective Ayala unlawfully searched the Ford escape twice. First, he did so on Second Avenue "immediately" after he arrived and spoke with the sergeant. Id. at 40. There was nothing imminently dangerous about the scene; to the contrary, it was broad daylight, there was a clear sky, and it was 1:30 in the afternoon. Id. at 81. Three marked NYPD vehicles were on the scene, and two officers had emerged from each, in uniform, armed with their service weapons. Id. at 82; see also Gov't Ex. 7 (BWC footage). In addition, nothing about Mr. Rumph created a safety concern. He was the only person in his car. Hrg. Tr. 82. Mr. Rumph was entirely cooperative with the police; when stopped, he stretched his hands and head out of the window, so the officers could see his hands clearly. As an additional safety precaution, Mr. Rumph put his keys on the outside of the windshield, so the officers knew he couldn't drive away. Id. at 83-4. Mr. Rumph was polite throughout the encounter, addressing the officers as "sir" and following their instructions. Id. At the time Detective Ayala conducted this first search, Mr. Rumph was already in handcuffs. Uniformed officers flanked him – one stayed by his right arm and the other by his left arm – the entire time they were on the scene. Id. at 85. The remaining officers positioned themselves around them. Id. When asked if the car contained any weapons, Mr. Rumph said no. Id. at 86. Detective Ayala had not yet discovered Mr. Rumph's open I-Card.

3

Despite those circumstances, Detective Ayala immediately searched the car: "I went immediately to the front right passenger, like, the driver – the driver's side, the front left driver's side." Id. at 41. He did a very thorough search: he looked inside the front driver's door, inside the rear driver's side door, and underneath the belongings on the back seat; he folded down the back seat, looked around the trunk, and looked in bags that were inside; another officer started to help him and used his flashlight while searching through the car; then, Detective Ayala walked to the passenger side and opened the rear door, went through the passenger seat, and the belongings that were located there (including bags he found); he opened the front passenger seat, and he pushed on the air conditioning vents and opened the glove compartment and went through its contents. Id. at 89-91. This search exceeded the bounds of the Fourth Amendment.

Detective Ayala testified that his justification for this warrantless search was: "looking for the marijuana that [Mr. Rumph] stated was in the vehicle," id. at 41, and "looking in the immediate area for any weapons that would hurt me or anyone else," id. Neither of those justifications, in the circumstances present here, are valid under the Fourth Amendment. See Rumph Mot. 5; Arizona v. Gant, 556 U.S. 332, 346 (2009). Neither the automobile exception nor the "automobile frisk" exceptions militate otherwise. Cf. United States v. Bulluck, 09 Cr. 652 PGG, 2015 WL 4998573, at *6 (S.D.N.Y. Aug. 20, 2015) (finding there was insufficient probable cause to justify the automobile exception) (citing United States v. Paulino, 850 F.2d 93, 94, 96 (2d Cir.1988) (same)); Id. (urging a fact-specific inquiry to determine "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger" and finding the "automobile frisk") (citing Michigan v. Long, 463 U.S. 1032 (1983)). Here, at the time the first search commenced, there was no justification to search for evidence of the robbery without a warrant; the car was immobile, and Mr. Rumph was under arrest and away from the car, vastly outnumbered by law enforcement officers. There was also no threat to officer safety.[4] Thus, this search was unlawful.

Nor was there probable cause to believe that the car contained proceeds of the July 7 robbery when it was pulled over on Second Avenue on October 1. As described above, Detective Ayala conceded he had no idea where the car had been, who had been driving it, or if it was sold or borrowed during the three months that had elapsed. Id. at 75. The items that the robber used during the robbery were small, mobile, and transferrable (e.g. the firearm, the face mask, the sunglasses, the gloves, the bag, etc.); there is nothing about those items that makes them likely to remain in one place over time. See Rumph Reply in Support of Motion to Suppress ("Rumph Reply"), p. 3-5 (discussing how the government's arguments that the three-month time lapse does not change the probable cause inquiry must fail).

---

[4] Detective Ayala asked Mr. Rumph two questions: first, if "he has anything in the car that he's not supposed to have?" to which he answered "marijuana" and second, "do you have any weapons, guns, or knives?" and he said no. Hrg. Tr. 86. Detective Ayala cannot have it both ways; either he credited Mr. Rumph's statements, and should have concluded there was less of safety concern because of the absence of weapons, or he didn't credit Mr. Rumph's statements and there was no basis at all to believe there was marijuana in the car.

The second search was also unlawful. It was <u>not</u> a proper inventory search, following Mr. Rumph's arrest on the I-Card. Instead – as Detective Ayala admitted – it was an investigatory search regarding the July 7 robbery, which he conducted without a warrant.

After discovering that Mr. Rumph had I-Card for an unrelated case, Detective Ayala drove the Ford escape to the 32nd precinct. He told the Court why: he wanted to investigate the July 7 robbery further. He did not seize the car because of the I-Card:

> Q. And on this occasion, did you take the car into custody because of the I-Card?
> A. No.
> Q. You took the car into custody because you wanted to investigate the July 7 robbery, right?
> A. Yes.

Hrg. Tr. 94.

An inventory search is permissible if it adheres to "standardized criteria ... or established routine." <u>United States v. Thompson</u>, 29 F.3d 62, 65 (2d Cir. 1994) (citing <u>Florida v. Wells</u>, 495 U.S. 1, 4 (1990). "The existence of such a valid procedure may be proven by reference to either written rules and regulations, or testimony regarding standard practices. <u>Id.</u> (internal citations omitted). And, "the procedure must not be a pretext 'for a general rummaging in order to discover incriminating evidence.'" <u>Id.</u> at 65-66 (citing <u>Wells</u>, <u>supra</u>).

Detective Ayala searched the Ford escape for evidence from the July 7 robbery – and for that investigatory search, he needed a warrant. The government's efforts to label this second search an "inventory search" is counter to law and fact.

First, there is no documentation of any "inventory" search. Hrg. Tr. 90 ("Q. There is no written record of this so-called inventory search, right? A. No."). For example, there is no listed inventory of items (i.e. what you would expect to be generated during an inventory search) anywhere. Nor is there any notation in any of the NYPD or ATF paperwork that Detective Ayala conducted an inventory search.

The whole point of an inventory search is to inventory – or, document – the items that come into police custody and the items that are released from police custody. Detective Ayala himself told us why:

> Q. And what's your understanding as to why you need to inventory a vehicle taken into police custody?
> A. So that we can properly safeguard the items that are in the vehicle and we can prevent any theft or any claims of lost articles or items, or items that were not in it or in it that are not there anymore, but to properly document, like, take a note of what's in the vehicle so we can safeguard it.

<u>Id.</u> at 48.

5

But here, Detective Ayala did neither:

> Q. Okay. And you told us that the purpose of an inventory search is – I think this is a direct quote from your direct examination – it's to itemize every item, right?
> A. Yes.
> Q. So that you know what NYPD is taking into custody, right?
> A. Yes.
> Q. Now, in this case, you did not itemize every item from the car, right?
> A. No.

Id. at 99.

> Q. You did not itemize them item by item as you just told us an inventory search required?
> A. It's – those are practices. Those are guides. There's not like a law requirement on it.
> Q. But you didn't do it?
> A. That's correct.
> Q. There exists no list anywhere of what you did in this so-called inventory search?
> A. That's correct.

Id. at 100.

Instead, Detective Ayala decided there were two types of items in the car (1) items relevant to his robbery investigation and (2) everything else (some of which he called "personal property"), which he returned to a friend of Mr. Rumph. He <u>only</u> documented the former, i.e. items that were related to his robbery investigation.

> Q. You only itemized what you thought was evidence in your July 7 robbery investigation?
> A. I itemized evidence, and then I itemized personal property.

Id. at 99.

By "itemized," Detective Ayala did not mean that he made a list. Instead, he took a select number of photographs. The photographs were not comprehensive – they were primarily of items relevant to the robbery investigatory. This selection is contrary to the purpose of an inventory search. Indeed, Detective Ayala did not even follow his own (albeit insufficient) "inventory" practices:

> Q. Is it your practice to document what you find during an inventory?
> A. Yes.
> Q. How do you usually do that?
> A. I take a good image of the vehicle. I like to capture a picture of <u>all the items and articles in the vehicle</u>, so I – several pictures and photos of the condition that the vehicle is in at the time.

Id. at 48 (emphasis added).

Here, he did not photograph every item or article in the car.  See Gov't Ex. 11A-J, L, N, O.[5]

For the second category, Detective Ayala released a bunch of items to Mr. Rumph's friend – without making any record of them at all.  Id. at 101 (Q. And you also gave a bunch of stuff from the car that you decided not to keep, right? A. Yes. Q. And there's no written record of what you gave back except for the photographs in Government Exhibit 11, right? A. That's correct.)  Such a release of unknown items is exactly what inventory searches are meant to prevent; if a person later claimed the NYPD lost the item, Detective Ayala would have no proof that he handed it to Mr. Rumph's friend last October.

Thus, there can be no credible argument that Detective Ayala's second search of the Ford escape was a proper inventory search; it was a warrantless search in furtherance of his July 7 robbery investigation.  This violated the Fourth Amendment and the results of that search must be suppressed.

**The Search of the Vehicle was Not Inevitable**

The government argued in its opposition brief that the inevitable discovery doctrine defeats suppression in this case.[6]  At the hearing, Detective Ayala testified that "sometimes" he takes a vehicle into custody after discovering an I-Card and "sometimes" he doesn't.  Given this plain uncertainty and discretion, the inevitable discovery doctrine does not apply.

The inevitable discovery doctrine requires that the hypothetical search be a "foregone conclusion."  United States v. Eggers, 21 F. Supp. 2d 261, 273 (S.D.N.Y. 1998).  "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment."  Id. (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  Thus, it is not sufficiently "inevitable" when it "is possible" or shown to be "more probably than not" that the evidence would have been seized lawfully.  See id.; United States v. Cabassa, 62 F.3d 470, 474 (2d Cir. 1995).  When there is "uncertainty of the results" or "other plausible contingencies," the inevitable discovery doctrine cannot apply.  United States v. Guarino, 12 Cr. 481, 2013 WL 12080921, at *5 (N.D.N.Y. Sept. 23, 2013), aff'd, 578 Fed. Appx. 1 (2d Cir. 2014); United States v. Stokes, 733 F.3d 438, 446 (2d Cir. 2013).  And, the government must prove the inevitability by "a preponderance of the evidence."  Eggers, 21 F. Supp. 2d at 273; see also Cabassa, 62 F.3d at 474 (there is "a difference between proving by a preponderance that something would have happened and proving by a preponderance that something would inevitably have happened").

---

[5] And, Detective Ayala's photos did not capture where the items were actually found in the vehicle.  Instead, he moved the items and posed them for the photos.  See Hrg. Tr. 103.

[6] In its opposition motion, the government argued that the car would have "inevitably" been searched following Mr. Rumph's alleged red-light traffic violation.  See Gov't Opp. 16-17.  It elicited no such testimony at the hearing – instead, it had Detective Ayala testify about the protocols of making arrests on I-Cards.  Thus, we do not address that abandoned argument here.

Here, the government has not even come close to meeting its burden, because it the hearing testimony made clear that the seizure of a vehicle in these circumstances is "uncertain" and subject to various "contingencies."

Detective Ayala knows about vehicle stops. During the 16 years he has worked at NYPD, he has made "Hundreds. Many. Many vehicle stops." Hrg. Tr. at 7-8. On direct examination, Detective Ayala explained that it "is the protocol" to take a car into custody when the driver has an arrest I-Card. Id. at 46-47. When asked on cross if he meant that "you have to take that car into custody" when "probable cause to arrest I-Card that comes up during a vehicle stop," he said no. Id. at 93 (emphasis added). Detective Ayala clarified that the arrest of the person is mandatory, but not the seizure of that person's vehicle. See id. In fact, he testified that he only seizes the vehicle "sometimes." Id.

> Q. …Isn't it true that when you perform vehicle stops that lead to arrests, sometimes you take the car into custody, right?
> A. That's correct.
> Q. But sometimes you don't, right?
> A. That's correct.
> …
> Q. Sometimes you call the loved one of the arrestee and ask them to come pick up the car off the street, right?
> A. Yes.
> Q. In other words, you don't always take the car with you back to the precinct just because you're making an arrest, right?
> A. That's correct.

Id.

This is precisely the type of "uncertainty" and varied "contingencies" that mean the inevitable discovery doctrine cannot apply.

Even if the Court were to conclude, arguendo, that the seizure of the car was inevitable, the government would also have to prove that the subsequent inventory search of the car was inevitable – and they have failed to do that too.

> Q. … Some items are kept as arrest evidence, right?
> A. Yes.
> Q. And some items are kept just for safekeeping, right?
> A. Yes.
> Q. … the patrol guide says that vehicles can simply be safeguarded at a precinct, right?
> A. I have to – from my understanding, yes.

Id. at 97.

On this record, there no evidence that an inventory search is inevitable following a vehicle seizure. Id. at 97-98. Thus, there is insufficient evidence that an inventory search would have been inevitable either.

8

**Conclusion**

      For all of these reasons, as well as those laid out in his pre-hearing briefing, Mr. Rumph's motion to suppress should be granted.

Respectfully submitted,
/s/
Sylvie Levine
Attorney for Mr. Rumph