**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

September 26, 2024

**VIA ECF**
Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re:** **United States v. Robert Rumph**
**23 Cr. 603 (ALC)**

Dear Judge Carter,

     I write in reply to the government's post-hearing letter brief ("Gov't Ltr."), Dkt. No. 43, and in support of Mr. Rumph's pending motion to suppress evidence.

**The Search of the Car on Second Avenue Violated the Fourth Amendment**

     The automobile exception only permits a warrantless search if "probable cause exists to believe the vehicle contains contraband or other evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004). See Gov't Ltr. 6. The parties agree on the standard: "[P]robable cause to search exists where circumstances indicate a 'fair probability that contraband or evidence of a crime will be found in a particular place.' Ganek v. Leibowitz, 874 F.3d 73, 82 (2d Cir. 2017). It is a 'fluid concept—turning on the assessment of probabilities in particular factual contexts.' Gaskin, 364 F.3d at 456." Id.

     The government acknowledges – as it must – that "[p]robable cause may be lacking 'where the facts supporting criminal activity have grown stale. United States v. Raymonda, 780 F.3d 105, 114 (2d Cir. 2015) (emphasis omitted)." Id. at 7. "Central to the staleness question in this case is the nature of the property sought and its relationship to the location in which it was sought…In this regard, courts tend to distinguish between personal property that is moveable or likely to dissipate over time, such as drugs or cash, and property of a more permanent nature that is likely to be maintained in one place for longer periods of time, such as business records." United States v. Salomon-Mendez, 992 F. Supp. 2d 340, 347-48 (S.D.N.Y. 2014). The government agrees that the "passage of time" alone "is not controlling and is but one factor to be considered." Gov't Ltr. 7 (citing United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004)). Indeed, "'the kind of property sought' and the nature and length of the criminal activity are other factors that courts consider." Id.

That the car Mr. Rumph was driving on October 1 matched the description – even, the unique description – of the car driven away from the scene of the July 7 robbery is not enough to justify Detective Ayala's warrantless search of the vehicle. On October 1, the likelihood that that the red van with two white doors would still contain evidence of the July 7 robbery – or be driven by the person who drove it on July 7 – fell below the standard for probable cause required by the automobile exception. See Hearing Transcript ("Hrg. Tr.") at 33, 75 (Detective Ayala admitting that he had no identifying information about the driver and no idea where the car had been, who had been driving it, or if it had changed hands in the three months between July and October).

The government does not cite a single case to the contrary. Instead, it cites to three types of cases – none of which support its arguments.[1] First, the government cites to cases in which a car that matched the description of a car used in a crime was pursued <u>immediately after</u> the crime in question. See Rumph Reply Br. (Dkt. No. 29) at 2-3 (explaining why Chambers v. Maroney, 399 U.S. 42, 47-48 (1970) and United States v. Wallace, 97 Cr. 975 (RWS), 1998 WL 401534, at *9 (S.D.N.Y. July 17, 1998) are distinguishable from the instant case). Here, it is precisely the lack of contemporaneity that undermined the finding of probable cause. Thus, those cases do not support a finding that law enforcement could search Mr. Rumph's car three months after the alleged robbery.

Second, the government cites to cases where courts overcame questions of staleness – but did so because they had far more information supporting a finding of probable cause than it had here. See Rumph Reply Br. 3-5. For example, in Salomon-Mendez, 992 F. Supp. 2d at 344, in addition to the car matching the make, model, and color of the car from the surveillance video, law enforcement had a cooperating witness who had told them specifically about the car's involvement in two robberies and law enforcement had twice corroborated the cooperator's information regarding the robberies in question. In United States v. Pizarro, 17 Cr. 151 (AJN), 2018 WL 1737236, at *9 (S.D.N.Y. Apr. 10, 2018), aff'd, 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023), in addition to matching the make, model, and color of the car, law enforcement had found the defendant's fingerprint at the scene of the robbery, a license plate reader and cell site data had established prior surveillance of the scene, and law enforcement had been watching the defendant and knew he had "continuing use of the vehicle" and that it was registered to two different women with whom the defendant had a romantic connection. And, as we noted in our Reply brief, in Pizarro, law enforcement did exactly what it should have done here – they presented these facts to a magistrate and obtained a search warrant before the search. Here, law enforcement's only justification for its warrantless car search was the matching description of the vehicle. It had no additional information about the car – and no information whatsoever about the July 7th driver, except that he was a black male. Thus, these cases, too, do not support a finding of probable cause in this case.

Third, the government cites to cases where magistrate judges issued warrants for various types of premises, for various types of evidence, after various amounts of time had elapsed. See

---

[1] The government uses the same cases it used it its original opposition brief. See Dkt. No. 26. Thus, we use many of the same arguments we used in our original reply brief ("Rumph Reply Br."). See Dkt. No. 29.

2

United States v. Singh, 390 F.3d 168, 181-82 (2d Cir. 2004); United States v. Siddiqi, 06 Cr. 377 (SWK), 2007 WL 549420, at *8 (S.D.N.Y. Feb. 21, 2007); United States v. Beltempo, 675 F.2d 472, 477 (2d Cir. 1982); and United States v. Brinklow, 560 F.2d 1003, 1006 (10th Cir. 1977). As described in our reply brief, the problems with reliance on those cases here are twofold: first, they involved the precise Fourth Amendment activity law enforcement erroneously side-stepped here, i.e. the application for a warrant. Second, all of the government's cases involve premises and evidence that were far less likely to change hands or be in someone else's control three months after the incidents in question. See Rumph Reply Br. 5 (describing Singh, 390 F.3d at 181-2 (search of a home for business records law enforcement knew were kept there); Beltempo, 675 F.2d at 477 (search of a home for "heroin… [that was] a powder that does not dissolve or evaporate and whose presence an expert indicated lingers for a period of some months" that was "within the pile of a rug"); Siddiqi, 2007 WL 549420, at *8 (search of two desktop computers within a home because they "are innocuous durable goods that are likely to be kept over a period of years"); and Brinklow, 560 F.2d at 1006 (search of a motor home for specific items identified by the defendant's accomplice, including "band radio equipment, originally intended to electronically detonate the bombing device, a police radio scanner utilized by the pair to avoid police detection, and a notebook delineating dates and mileage figures of trips taken in the motor home"). Here, law enforcement was not searching a home nor for items that were immobile; these differences undermine the government's arguments against staleness.

Before the October 1 search of the car, law enforcement had insufficient information that any items related to the robbery would be found inside. Again, the government impermissibly points to the items that were found during the search to justify law enforcement's decision to conduct the search in the first place – but that kind of retrospective analysis is not permitted. See Rumph Reply Br. 5. Instead, law enforcement should have expected that robber-1 would have left the vehicle and taken with him his temporary, easily transferrable items (like the sunglasses, a hat, gloves, bag, and gun), rather than leave them behind. Moreover, the government repeatedly points out that the van in October had temporary plates, which are inherently short-term and replaceable; thus, this case is different than Salomen-Mendez, 992 F. Supp. 2d at 348 where the court found that ownership documents are "unlikely to be removed from a car."

Finally, the government again argues that even if the search was unlawful, the good-faith exception should apply. As we argued in our reply brief: if the government could not find a single case where officers were allowed to search a car allegedly involved in a crime three months earlier, in a different borough, with no identifying information about the driver, how could law enforcement possibly have believed in good faith that such a scenario was within the permitted exceptions to the warrant requirement? The Court should make no such finding. See Rumph Reply Br. 6.

## The Police Immediately Exceeded their Authority When they Pulled Over Mr. Rumph

The government argues that "the stop of [Mr.[ Rumph's vehicle" was supported by at least reasonable suspicion regarding the July 7 robbery or by the traffic infraction Detective Ayala claims he observed on October 1. Gov't Ltr. 10. But law enforcement did not conduct a car stop – they conducted a full-blown arrest. See Rumph Post-Hrg. Ltr. (Dkt. No. 40) at 1 (describing how Mr. Rumph was immediately "removed from his vehicle, handcuffed, and

3

escorted away from his car; he remained surrounded by at least 6 uniformed, armed police officers, two of whom remained holding his arms behind his back, monitoring the handcuffs"). As described above, and in Mr. Rumph's previous briefing, this arrest was unjustified. See Rumph Post-Hrg. Ltr. 1-2 (arguing that the police had insufficient evidence that the driver of the car on October 1 had anything to do with the July robbery and confirming that the arrest was for the robbery, not a traffic infraction). Law enforcement did not have the requisite probable cause to arrest Mr. Rumph when they did.

**The Search of the Car at the Precinct was Not a Lawful Inventory Search**[2]

In determining whether a law enforcement officer actually engaged in an inventory search – as opposed to "general rummaging in order to discover incriminating evidence," see United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) (citing Florida v. Wells, 495 U.S. 1, 4 (1990) – "the key issue is whether the officers conducting the inventory search acted in bad faith or solely for the purpose of investigation. If the answer is yes, the court must suppress the fruits of the inventory search." United States v. Banks, 150 F. Supp. 2d 548, 554 (S.D.N.Y. 2001) (internal citations omitted).

Here, the government has not presented any evidence regarding the NYPD (or ATF) protocols for inventory searches, nor any evidence that Detective Ayala complied with them. Instead, Detective Ayala's actions are the type of "rummaging" for "incriminating evidence" that the Fourth Amendment prohibits.

Indeed, the single case cited by the government, see Gov't Ltr. 12, supports suppression. In United States v. Banks, 150 F. Supp. 2d 548, 553 (S.D.N.Y. 2001), the government presented to the hearing court evidence of the specific procedures law enforcement followed, pursuant to the NYPD Patrol Guide and the DEA Agent Manual. In turn, the court was able to analyze whether the behavior in question (lifting the specific type of floor mat in the defendant's vehicle) fell within the Patrol Guide's permission to search "under floor mats" during an inventory search. See Banks, 150 F. Supp. 2d at 551-53 (reviewing the mandates of the NYPD Patrol Guide and the DEA Agent Manual and determining that "[law enforcement] conducted the inventory search of the mini-van pursuant to procedures that mandated a thorough search of the vehicle and directed him to look, among other places, under any floor mats"); see also United States v. Thompson, 29 F.3d 62, 66 (2d Cir. 1994) (noting that the evidence at the hearing included both "officers' testimony concerning the [police department's] standard policy" and "the [department's] written regulations" and determined that the officers followed those regulations).

Here, the government has not presented a single NYPD guideline for an inventory search against which the Court could measure Detective Ayala's actions. In the absence of such a record, the government is essentially asking the Court to guess at what the guidelines are, and then take Detective Ayala at his word that he followed those guidelines. On this record, the government has not demonstrated that a lawful inventory search was conducted.

---

[2] In its post-hearing letter brief, the government appears to have abandoned its pre-hearing arguments regarding inevitable discovery, thus we do not address them here.

4

To the contrary, Detective Ayala's actions are contrary to his contention that he conducted an inventory search. As we have previously argued, he created <u>no inventory</u>. Rumph Post-Hrg. Ltr. 5-6 (quoting Hrg. Tr. 90 ("Q. There is no written record of this so-called inventory search, right? A. No.") and Hrg. Tr. 100 ("Q. There exists no list anywhere of what you did in this so-called inventory search? A. That's correct.")). This stands in stark contrast to the single case cited by the Government. In <u>Banks</u>, in determining that an inventory search had taken place, the Court relied on the fact that an actual inventory was generated: "the fact that [law enforcement] prepared a list of [the defendant]'s personal items and handed them over to his brother supports the conclusion that the inventory search was not conducted solely for investigatory purposes." <u>Banks</u>, 150 F. Supp. 2d at 554. The <u>Banks</u> court explained that the officer's thoroughness in creating the list "speaks to [the officer's] concern that there be a record of the items (presumably, to protect the police from liability). As explained above, this is precisely type of concern an inventory search is designed to allay." <u>Id.</u> 554 at n. 9.

Here, Detective Ayala's utter failure to make any list at all, and any comprehensive accounting of the items, undermines the conclusion that he was conducting an inventory search. (And, the government's efforts to say that photographs are a sufficient substitution must also fail, because, as discussed in our post-hearing brief, the photographs are (a) not comprehensive and (b) were staged to highlight the items relevant to Detective Ayala's robbery investigation. <u>See</u> Post-Hrg. Ltr. 7.) Because no lawful inventory search was conducted, the fruits of the second search must be suppressed.

**<u>Conclusion</u>**

For all of the reasons in Mr. Rumph's pre- and post-hearing briefing, his motion to suppress should be granted.

Respectfully submitted,
/s/
Sylvie Levine
Attorney for Mr. Rumph