

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 17, 2025

**BY ECF**

The Honorable Andrew L. Carter, Jr.
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:   *United States v. Robert Rumph*, 23 Cr. 603 (ALC)

Dear Judge Carter:

    The Government respectfully submits this letter brief in support of its position that the enhancements set forth in U.S.S.G. §§ 2B3.1(b)(2)(C) (brandishing or possessing a firearm during robbery) and 2B3.1(b)(4)(B) (physical restraint of a person during a robbery) should be applied in the calculation of defendant Robert Rumph's sentencing Guidelines calculation.

    I.    **PROCEDURAL HISTORY & GUIDELINES DISPUTE**

    On October 18, 2023, the Government charged Rumph by complaint with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951, and Hobbs Act robbery in violation of 18 U.S.C. § 1951 and 2, in connection with a smoke shop robbery in the Bronx that occurred on July 7, 2023. Rumph was arrested the following day and presented before the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York. On November 16, 2023, a grand jury in this District returned an indictment charging Rumph with the same two counts. On August 7, 2024, the Court held a hearing on Rumph's motion to suppress certain evidence, during which the Court heard testimony from New York City Police ("NYPD") Detective and Task Force Officer Kenneth Ayala, and received into evidence numerous photographs and video exhibits relating to the robbery. On October 15, 2024, the Court denied Rumph's motion to suppress. On December 3, 2024, after waiving indictment, Rumph pled guilty pursuant to a plea agreement to a one-count Superseding Information charging him with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 371, which carries a maximum term of imprisonment of five years.

    Rumph's plea agreement notes that, although the parties agree that Rumph's criminal history category is III, the parties did not stipulate to Rumph's total offense level. Specifically, the parties disagree about the applicability of the firearm and physical restraint enhancements set

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 2 of 18

forth in U.S.S.G. §§ 2B3.1(b)(2)(C) and 2B3.1(b)(4)(B).  For the reasons stated more fully below: (i) pursuant to U.S.S.G. § 2B3.1(b)(2)(C), a five-level increase is warranted because a firearm was brandished or possessed during the robbery; and (ii) pursuant to U.S.S.G § 2B3.1(b)(4)(B), a two-level increase is warranted because a person was physically restrained to facilitate commission of the offense or to facilitate escape during the robbery.  Rumph asserts that neither enhancement applies.

The parties' dispute gives rise to the following scenarios for the Court's calculation of Rumph's Guidelines range:

- If the Court applies the five-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(C) and the two-level enhancement pursuant to U.S.S.G § 2B3.1(b)(4)(B), the applicable Guidelines offense level would be 24.  With criminal history category III, the Guidelines range would be 63-78 months' imprisonment.  Pursuant to U.S.S.G. § 5G1.1(a), because the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the Guidelines sentence under this scenario would be the statutory maximum term of imprisonment, which is 60 months' imprisonment.

- If the Court applies the five-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(C), but does not apply the two-level enhancement pursuant to U.S.S.G § 2B3.1(b)(4)(B), the applicable Guidelines offense level would be 22.  With criminal history category III, the Guidelines range would be 51-63 months' imprisonment in the absence of the statutory maximum sentence of 60 months.  Pursuant to U.S.S.G. § 5G1.1(c), because the statutory maximum sentence is 60 months' imprisonment, the applicable Guidelines range under this scenario would be 51-60 months' imprisonment.

- If the Court does not apply the five-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(C), but does apply the two-level enhancement pursuant to U.S.S.G § 2B3.1(b)(4)(B), the applicable Guidelines offense level would be 19.  With criminal history category III, the Guidelines range would be 37 to 46 months' imprisonment.

- If the Court does not apply either the five-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(2)(C) or the two-level enhancement pursuant to U.S.S.G § 2B3.1(b)(4)(B), the applicable Guidelines offense level would be 17.  With criminal history category III, the Guidelines range would be 30 to 37 months' imprisonment.

Rumph is scheduled to be sentenced by this Court on April 8, 2025.  In accordance with the briefing schedule set by the Court at Rumph's change-of-plea conference, the Government submits this letter brief to address the parties' Guidelines dispute.  Pursuant to the Court's individual practices, the Government will file its sentencing submission one week before the sentencing date.

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 3 of 18

## II. OFFENSE CONDUCT

### A. The July 7, 2023 Armed Robbery

At approximately 10:25 a.m. on July 7, 2023, a black male ("Robber-1") robbed a smoke shop at gunpoint in the vicinity of East 167th Street and Sherman Avenue in the Bronx (the "Smoke Shop"). (PSR ¶ 11). As shown on surveillance video from the interior of the Smoke Shop, Robber-1 carried a distinctive black tote bag with white lettering, and wore all dark clothing, a white mask, blue gloves, dark sunglasses, and a white baseball cap with a black brim. (*Id.*); (GX-1) (interior surveillance video from main room of the Smoke Shop).[1]  After entering the smoke shop, Robber-1 drew a black handgun from the bag, brandished it at a store clerk ("Store Clerk-1"), and forced Store Clerk-1 and a second store clerk ("Store Clerk-2") into the store's back room. (PSR ¶ 12); (GX-1). Still images of Robber-1 from GX-1, showing the main room of the Smoke Shop, are depicted below:

  

*Robber-1 walks into Smoke Shop carrying black tote bag*

*Robber-1 pulls black handgun out of black tote bag and brandishes it at Store Clerk-1*

(GX-1).

---

[1] The GX numbers of the exhibits submitted in connection with this letter brief (GX-1 through GX-6) match the exhibit numbers for the exhibits submitted during the August 7, 2024 suppression hearing. GX-15, 16, and 17 are new exhibits, which were not introduced during the suppression hearing.

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 4 of 18

After forcing the clerks into the back room, Robber-1 gave the black tote bag to Store Clerk-1 and pointed the gun at the clerk's head. (GX-1); (GX-15) (interior surveillance video from back room of the Smoke Shop). Robber-1 then ordered Store Clerk-2 to exit the back room and retrieve cash from the cash register in the main room of the Smoke Shop, which Store Clerk-2 did. (GX-1); (GX-15). A still image from GX-15 of Robber-1 pointing the gun at Store Clerk-1 (who was holding the black tote bag) inside the Smoke Shop's back room is depicted below:



(GX-15).

After retrieving cash from the register, Store Clerk-2 returned to the back room and, at the direction of Robber-1, placed cash into the black tote bag held by Store Clerk-1. (GX-15). Robber-1 then grabbed the black tote bag, took a roll of duct tape out of the bag, and ordered Store Clerk-2 to tie Store Clerk-1's hands together behind his back with the duct tape. (PSR ¶ 13); (GX-15). Still images from GX-15 of Robber-1 pulling the roll of duct tape out of the black tote bag and handing it to Store Clerk-2 are depicted below. The roll of duct tape is circled in red in both images depicted below. As can be seen in both images, the word "Thank You" appears on the bag in white lettering five times.

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 5 of 18





(GX-15).

After Store Clerk-2 tied Store Clerk-1's hands behind his back with the duct tape, Robber-1 tied Store Clerk-2's hands behind his back with the duct tape, exited the room, and fled the store with $400 in stolen cash. (GX-15). As depicted below, exterior surveillance footage shows that after exiting the Smoke Shop, Robber-1 walked to a red Ford Escape with white driver's side doors (the "Getaway Car"), which was waiting for Robber-1 on E. 167th Street, just south of Sherman Avenue. (GX-6 (exterior surveillance video showing the intersection of E. 167th Street and Sherman Avenue)); (Dkt. 35 at 14-18 (Det. Ayala describing location and orientation of surveillance cameras in the vicinity of the robbery)). As law enforcement later determined, the Getaway Car was driven by the defendant, Robert Rumph. (PSR ¶ 15). Rumph then fled the scene with Robber-1 in the Getaway Car. (*Id.*); (GX-6). Still images from GX-6, of Robber-1 walking to the Getaway Car and being driven away by Rumph, are depicted below:





(GX-6).

### B. Rumph, the Getaway Car Driver, Helped Prepare For and Execute the July 7, 2023 Armed Robbery

Surveillance video from multiple vantage points along Sherman Avenue and E. 167th Street collectively shows that Rumph actively assisted Robber-1 before, during, and after the robbery.[2]

Rumph's Getaway Car first appears in surveillance video about an hour before the robbery on July 7, 2023. As depicted in a still image captured by NYPD Officer Michael Meneses from an NYPD Argus camera on the northwest side of the intersection of E. 167th Street and Sherman Avenue, the Getaway Car traveled westbound on E. 167th Street toward Sherman Avenue, at approximately 9:30 a.m. The still image captured by Officer Meneses[3] is shown below:



(GX-16); (PSR ¶ 23). The black tote bag used by Robber-1 during the robbery, with its distinct white lettering, is visible in the front passenger seat of the Getaway Car:

---

[2] To aid the Court, GX-17, discussed and depicted below on page 12, provides a map of the vicinity of the Smoke Shop and depicts the locations of Rumph's Getaway Car and relevant surveillance cameras.

[3] Officer Meneses captured the still image from the Argus camera video on or about July 25, 2023, in the course of the robbery investigation. The original video file was not preserved. As reflected on page 2 of GX-16, Officer Meneses uploaded the still image to the case file on August 6, 2023, noting that it "shows the vehicle with the black bag on the front passengers seat one hour prior to the incident." (GX-16).

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 8 of 18



(*Id.*).

In addition, surveillance video collected from the east side of Sherman Avenue just north of E. 167th Street shows that at approximately 9:40 a.m. (*i.e.*, still prior to the robbery, but ten minutes after Rumph drove the Getaway Car westbound on E. 167th Street with the black tote bag used by Robber-1 in the passenger seat), Rumph parked the Getaway Car on the west side of Sherman Avenue just south of E. 168th Street, facing south toward the Smoke Shop, just one block away from the Smoke Shop. (PSR ¶¶ 16, 23); (GX-2); (Dkt. 35 at 14-18). The video further shows Rumph intermittently cleaning, walking around, and standing near the Getaway Car during the next 45 minutes, prior to the robbery. (*Id.*). As shown on video, at approximately 10:25 a.m., Rumph then gets into the Getaway Car and drives southbound toward E. 167th Street to pick up Robber-1. (*Id.*). Still images from GX-2, showing Rumph—wearing shorts and a sleeveless white shirt—standing next to the parked Getaway Car and driving the Getaway Car to pick up Robber-1, are depicted below:

 

*Rumph standing next to the Getaway Car, parked on Sherman Avenue at 168th Street*   *Rumph driving the Getaway Car, southbound on Sherman Avenue toward E. 167th Street*

Video from the same time period (just minutes before the robbery) from the *west* side of Sherman Avenue shows Robber-1 walking southbound on Sherman Avenue's west sidewalk—that is, from the direction of the Getaway Car—on his way to rob the Smoke Shop. (GX-3); (PSR ¶ 23); (Dkt. 35 at 14-18). Robber-1 is seen dressed in the same clothing, hat, and mask that he

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 9 of 18

wore during the robbery, and carrying the black tote bag that he retrieved from the defendant's vehicle. (GX-3). The video shows that the black tote bag is open at the top and weighted as Robber-1 walks toward the Smoke Shop, suggesting that the gun and duct tape were present in the black tote bag as Robber-1 left the Getaway Car, and also that the gun and duct tape were likely inside the open black tote bag when the bag was seen in the Getaway Car about an hour before the robbery. (*Id.*).



(GX-3).

Just three minutes later, the same video shows Rumph drive the Getaway Car southbound on Sherman Avenue to pick up Robber-1, after Robber-1 completed the robbery. Still images from GX-3, of Robber-1 walking southbound on Sherman Avenue toward the Smoke Shop, and the Getaway Car driving southbound three minutes later, are depicted below:


*Robber-1 walking to the Smoke Shop*


*Getaway Car, three minutes later*

(GX-3).[4]

This sequence of events—Robber-1 leaving the Getaway Car on foot and walking to the Smoke Shop, followed minutes later by Rumph in the Getaway Car—is also depicted in surveillance footage from the northeast corner of the intersection of Sherman Avenue and E. 167th Street. That video—GX-4—shows Robber-1 walking southbound across E. 167th Street to the Smoke Shop (which is located just to the right of the green awning in the image below):



(GX-4).

---

[4] As NYPD Detective Kenneth Ayala testified during the August 7, 2024 suppression hearing in this case, the time stamp on GX-3—which shows 10:13 a.m. as the Getaway Car drives to the Smoke Shop—is incorrect. (Dkt. 35 at 24). The robbery occurred at approximately 10:25 a.m., and Rumph picked up Robber-1 from the Smoke Shop moments later. (*Id.*).

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 11 of 18

A clip from the same surveillance camera (GX-5) then shows the Getaway Car, minutes later, crossing the same intersection:



(GX-5).

At the same time the Getaway Car was crossing onto the south side of E. 167th Street, Robber-1 exited the Smoke Shop, carrying the black tote bag. Robber-1 walked briskly toward Sherman Avenue, to the Getaway Car, while wearing the same hat, mask, and dark clothing that he wore during the robbery. In the still image below, Robber-1 (who is circled in red) is seen walking out of the Smoke Shop and to the Getaway Car:



(GX-5).

Rumph stopped to wait in the Getaway Car for Robber-1, and once Robber-1 reached Sherman Avenue, Robber-1 entered the front passenger seat of the Getaway Car while still holding the black tote bag. Rumph then sped off, southbound on Sherman Avenue. (GX-6).

The video evidence—spanning an hour before the robbery and through to Robber-1's flight—thus shows that Rumph helped Robber-1 plan, prepare for, and execute the robbery.

\*     \*     \*

To aid the Court's understanding of the surveillance videos described above and submitted as exhibits GX-1 through 6, GX-15, and GX-16, a map of the intersection of Sherman Avenue and

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 12 of 18

E. 167th Street is depicted below and included as a separate exhibit, GX-17. The map indicates where Rumph parked the Getaway Car for approximately 45 minutes before the robbery, as well as the locations of the Smoke Shop and each of the exterior surveillance cameras discussed above. The green arrows indicate the general direction of the camera angle for each surveillance video:



(GX-9).

Rumph was ultimately identified as the Getaway Car driver following his October 1, 2023 arrest for an unrelated offense. (PSR ¶ 18). At the time of that arrest, Rumph was driving a red Ford Escape with white driver's side doors, which law enforcement officers recognized as the Getaway Car from the July 7, 2023 robbery. (*Id.*). A subsequent search of Rumph's car resulted in the recovery of Robber-1's distinctive hat and sunglasses, which were still in the vehicle. (PSR ¶ 19). A phone belonging to Rumph was also seized from his car, and historical cell site location information from that phone confirmed that it was present in the vicinity of the Smoke Shop at the time of the July 7, 2023 robbery. (PSR ¶ 20).

### C. Rumph's History of Armed Robberies

Rumph has numerous prior robbery convictions, including multiple armed robberies for which he has served substantial prison time:

- On January 26, 1985, Rumph and a co-conspirator robbed a victim at gunpoint at West 176th Street and Davidson Avenue in the Bronx. (PSR ¶ 44).

- On April 29, 1991, Rumph forcibly took a victim's property in the vicinity of 174th Street and Davidson Avenue in the Bronx. (PSR ¶ 46).

- On May 3, 1992, Rumph robbed a victim of their jewelry at gunpoint, near Inwood Place and Featherbed Lane in the Bronx. (PSR ¶ 47).

- On May 4, 1992, Rumph sliced a victim's face with a razor and forcibly removed their necklace near University and Tremont Avenue in the Bronx. (PSR ¶ 48).

- On September 8, 1993, Rumph forcibly removed necklaces from a victim on a subway train at East 167th Street in the Bronx. (PSR ¶ 49).

- On March 15, 1995, Rumph, using a gun, forcibly removed property from multiple victims in a subway station located in Manhattan. (PSR ¶¶ 51, 52).

- On April 3, 1996, Rumph was convicted of *five* counts of robbery. (PSR ¶ 50). An NYPD arrest report indicates that the convictions related to at least one armed robbery committed on March 16, 1995, during which Rumph, while displaying a gun, forcibly removed property from a victim on a subway platform located at 215th Street in the Bronx. (*Id.*). Rumph was incarcerated in connection with these convictions for 25 years, from 1995 to 2020.

Rumph has other arrests for armed robberies for which disposition records were not located by the Probation Office, including arrests for armed robberies on February 20, 1995; March 5, 1995; March 7, 1995; and March 14, 1995. (PSR ¶¶ 59-63).

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 14 of 18

### III.   THE FIREARM AND PHYSICAL RESTRAINT ENHANCEMENTS APPLY

#### A.   Applicable Law

The firearm and physical restraint enhancements at issue in the parties' Guidelines dispute provide as follows:

- U.S.S.G. § 2B3.1(b)(2)(C): "[I]f a firearm was brandished or possessed, increase by 5 levels."

- U.S.S.G § 2B3.1(b)(4)(B): "[I]f any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels."

The Court must determine the applicability of enhancements based on specific offense characteristics, on the basis of "relevant conduct." U.S.S.G. § 1B1.3. "In the case of a jointly undertaken criminal activity," meaning "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy," relevant conduct includes "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

The commentary to Section 1B1.3 emphasizes that "the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical." U.S.S.G. § 1B1.3, App. Note 3(D).

> For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was within the scope of the jointly undertaken criminal activity (the robbery), was in furtherance of that criminal activity (the robbery), and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

*Id.* As reflected in this example, the "nature of the offense" is itself probative of whether a coconspirator's conduct is reasonably foreseeable to a defendant. *See, e.g.*, *United States v. Graham*, 493 F. App'x 162, 168 (2d Cir. 2012), judgment vacated on other grounds, 570 U.S. 913 (2013) (use of firearm and assault were reasonably foreseeable to defendant "given the nature of the offense," which was a robbery of a fur store).

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 15 of 18

      **B.**      **Discussion**

There is ample evidence to conclude that it was reasonably foreseeable to Rumph that Robber-1 would possess or brandish a firearm, and physically restrain one or more victims, in the course of the July 7, 2023 robbery.

*First*, the evidence obtained during law enforcement's investigation establishes that Rumph actively participated in the preparation for, planning, and execution of the July 7, 2023 armed robbery. There is no dispute that Rumph agreed in advance of the robbery to assist Robber-1 as the Getaway Car driver. Rumph's plea allocution makes that clear: "I agreed to provide transportation to someone who did commit a robbery so they can leave the scene." (Dkt. 54 at 20-21).

Surveillance video collected from multiple vantage points along Sherman Avenue and E. 167th Street further shows the extent of Rumph's pre-robbery involvement. The Getaway Car is first seen at around 9:30 a.m., driving westbound on E. 167th Street toward Sherman Avenue. (GX-16). By approximately 9:40 a.m., Rumph had parked the car—which still contained the tote bag and its contents—one block north, on Sherman Avenue and E. 168th Street. (GX-2). That location was a perfect launching pad for the robbery. A block away from the Smoke Shop, it was within walking distance for Robber-1, and a quick, easy drive for Rumph to pick up his accomplice. Further reflecting a significant level of premeditation, Rumph spent the approximately 45 minutes before the robbery parked in that same location at E. 168th Street, intermittently sitting in, standing near, and cleaning the Getaway Car. (GX-2). Yet Rumph's residence was over five miles away from the Smoke Shop. (PSR ¶ 72). In other words, this was no crime of opportunity. Rumph planned it with Robber-1, understood that the robbery might involve the use of a firearm and duct tape, and traveled miles from his home to carry out that plan.

The surveillance video further shows how well coordinated Robber-1 and Rumph were in the execution of the robbery. Rumph knew exactly when to get into the Getaway Car to pick up Robber-1. Rumph's departure was timed so perfectly that he arrived at the pick-up point at the *exact* moment that Robber-1 was walking out of the Smoke Shop, with stolen cash in hand:



(GX-5).

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 16 of 18

Rumph did not just happen to be in the right place at the right time to help Robber-1 get away; to the contrary, he had full understanding of the robbery plan and his role in executing it.

*Second*, Rumph was in close proximity to Robber-1's gun and duct tape for nearly an hour before the robbery. GX-16 shows that Robber-1's black tote bag, which Robber-1 used to carry the gun he brandished at the store clerks and the duct tape he used to restrain them, was *inside* Rumph's car at 9:30 a.m. on the day of the robbery. The black tote bag's distinct pattern of five white "Thank You's" is clearly visible through the passenger side window of Rumph's car:

  

*Black tote bag in Getaway Car before robbery*     *Black tote bag during the robbery*

GX-16 thus makes clear that approximately one hour before the robbery, Rumph was driving to the pre-robbery parking spot with the open-top black tote bag, containing the gun and duct tape, within arms' reach in the passenger seat. To the extent the open-top black tote bag and its contents did not belong to Rumph, he would have been aware of their presence in his car and, ultimately, that they would be used by Robber-1 to commit the robbery.

Rumph's prolonged proximity to the gun and duct tape is further confirmed by GX-3. GX-3 shows Robber-1, at approximately 10:20 a.m., walking with the black tote bag, visibly heavy from the weight of the gun, on his way to rob the Smoke Shop. The Getaway Car, although not visible in the video, was just yards behind Robber-1 as he walked away from it. GX-3 thus suggests that Robber-1 was present at the Getaway Car with Rumph, with the gun and duct-tape in the black tote bag, for an extended period prior to the robbery.

The Court can and should conclude, based on GX-16 and GX-3, that Robber-1 took the black tote bag from inside the Getaway Car, in Rumph's presence, and then walked to the Smoke Shop to commit the robbery. Rumph would have seen Robber-1 take the clearly weighted bag from his car, while fully aware that Robber-1 was about to commit a robbery. So even if Rumph did not see the contents of the bag (which he likely did, given the bag's open top and extended presence in his car), it was at least reasonably forseeable to Rumph that it contained robbery tools such as a gun and duct tape.

GX-16 and GX-3 thus provide ample evidence—far more than a preponderance—for the Court to conclude that Rumph, given the active role he played in preparing for the robbery, either knew that Robber-1 was carrying a gun and duct tape to be used during the robbery, or at a minimum, that it was reasonably foreseeable to Rumph that Robber-1 possessed a gun and would restrain the robbery victims.

*Third*, even if Rumph never actually saw the gun or duct tape, the nature of the offense further supports the conclusion that it was reasonably foreseeable that Rumph's co-conspirator would possess a firearm and physically restrain the store clerks. Rumph helped plan and agreed to participate in a robbery of a smoke shop in a dense urban neighborhood; this on its own suggests that the gun and physical restraint were reasonably foreseeable to him. *See, e.g.*, *United States v. Graham*, 493 F. App'x 162, 168 (2d Cir. 2012), judgment vacated on other grounds, 570 U.S. 913 (2013) (affirming district court's application of firearm and bodily injury enhancements where defendant "planned and organized" the robbery and use of firearm was reasonably foreseeable "given the nature of the offense"); *United States v. Burton*, 126 F.3d 666, 679 (5th Cir. 1997) (affirming district court's determination that "given the nature of bank robbery," the defendant could have "reasonably foreseen that a [firearm] would be used during the robbery"). It strains credulity that Rumph would not contemplate—for a robbery of a Bronx smoke shop operated by one or more employees and potentially occupied by other customers—that Robber-1 would use a deadly weapon, such as a gun, and the tools necessary to restrain robbery victims from pursuing the fleeing robber or calling the police.

That is especially true given this particular defendant's history and characteristics. Rumph has been convicted of no fewer than *seven* robberies, at least four of which involved firearms, and all of which involved the forcible removal of property from victims. (PSR ¶¶ 44-52). With such a criminal history, it was, at a minimum, reasonably foreseeable to Rumph that the robbery he agreed to participate in would involve the use of a firearm and physically restraining victims to aid in the robbery or escape from the robbery. *See United States v. Woodard*, 64 F. App'x 290, 292 (2d Cir. 2003) (evidence regarding "prior use of guns" supported district court's finding that a co-conspirator's use of firearms during a robbery was foreseeable to defendant).

\*     \*     \*

The evidence establishes that Rumph was an active participant in the planning and execution of the robbery, that the gun and duct tape used by Robber-1 were inside Rumph's car for an extended period before the robbery, that Rumph would have seen Robber-1 carrying the open-top black tote bag containing the gun and duct tape prior to the robbery, and that the nature of the offense and defendant's criminal history support the conclusion that Rumph knew or could reasonably foresee that Robber-1 would use a gun and restrain his victims during the robbery.

Honorable Andrew L. Carter, Jr.
March 17, 2025
Page 18 of 18

### IV.     CONCLUSION

For the foregoing reasons, the Government respectfully submits that that the firearm and physical restraint enhancements set forth in U.S.S.G. §§ 2B3.1(b)(2)(C) and 2B3.1(b)(4)(B) should be applied in the calculation of Rumph's sentencing Guidelines calculation.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By:    _/s/_____
William C. Kinder
Assistant United States Attorney
(212) 637-2394

cc:   Sylvie Levine, Esq., counsel to the defendant, by ECF